Joseph Calcaterra v. Commissioner.
Calcaterra v. Commissioner
Docket No. 15170.
United States Tax Court
1948 Tax Ct. Memo LEXIS 52; 7 T.C.M. (CCH) 803; T.C.M. (RIA) 48220; October 28, 1948
*52 William H. West, Jr., Esq., 522 Fifth Ave., New York, N. Y., for the petitioner. John E. Mahoney, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax of petitioner for the taxable year 1944 in the amount of $7,130.24. In his original return for the taxable year, petitioner made a mathematical error in the computation of his tax payable, by reason of which his payment of tax was $1,000 in excess of the amount which would have been paid had his computations been mathematically correct. The Commissioner concedes that the deficiency determined fails to give credit to petitioner for the payment of $1,000 due to this mistake. Credit for this payment will be given in computations under Rule 50. The sole issue remaining is whether petitioner and his wife conducted a business as partners during the taxable years under such circumstances that the partnership should be recognized as having reality and validity for tax purposes. Findings of Fact Petitioner, Joseph Calcaterra, and his wife, Gladys, were married January 14, 1925. The income tax returns in question were filed with the collector of *53 internal revenue at Newark, New Jersey. Prior to the marriage, the wife Gladys worked as a clerk and bookkeeper for a loan office in New York. At the time of their marriage the wife had approximately $500 in savings, the greater part of which she deposited in a joint bank account which was opened in the name of her and her husband. For all the subsequent years the bank accounts of petitioner and his wife were maintained jointly and used both for business and living expenses. All property, with one exception which will be hereinafter mentioned, was also held jointly. In 1932 petitioner and his wife established a catalogue distribution service. This consisted of featuring manufacturers' booklets in several magazines. Upon request, these booklets were supplied by petitioner and his wife by mail and the respective manufacturers were then billed accordingly. The business was conducted almost entirely by the wife from their home. The petitioner also engaged in some free lance advertising and in making up catalogues and booklets. As early as 1932 Gladys agreed to assist petitioner and to devote all necessary time to the business. They had agreed that any profits which might result from *54 the business would be shared equally. Gladys never received compensation or reimbursement for the services she performed. All of the proceeds of the business were placed in the joint bank accounts. In 1934 petitioner and Gladys began the business of printing small labels. The smallest label was five-eighths of an inch by onefourth of an inch, and the largest label was not over one and one-half inches in length. These labels were intended by radio parts manufacturers to be used to "anchor" parts and to identify the particular part and the name of the maker. Ninety per cent of this printing was performed for three manufacturers. In 1934 or 1935 the petitioner bought a printing press for approximately $2,000. Payments for the press were made over a period of ten years. In order to meet some of the payments on the press, to purchase supplies, and to meet other expenses, Gladys borrowed $250 from her father and $175 on her life insurance, which sums were placed in the joint bank accounts in 1936. A cutter, used to cut the labels to size after they had been printed, cost from $250 to $400 when purchased in late 1941. In 1941 land of the value of $1,750 was purchased and a building constructed *55 costing $17,444. This building contained a first floor, a basement, and an attic. There were four rooms on the first floor, which were used for living purposes. The basement was specially devoted to the printing business. Records were kept in the attic. By 1944, the tax year in question, the label business, operated under the name of The Calcaterra Service, was the only business of petitioner and his wife. The business required very little activity away from the home. The petitioner customarily set up the form and laid the type for the labels. The form was then placed in the printing press, and the wife ran the press. She put on the paper, saw that it was running, kept it properly inked, and saw that the flamedrying process did not start fires. Petitioner then used the cutter, of the guillotine type, to cut the labels. First the length separation was cut; then the cross cut reduced the labels to the proper size. The paper was cut in stacks of 500. The wife then checked the labels against the orders, and packed them in corrugated boxes. She then mailed the shipment through the United States Mails. Orders were usually received by mail or phone. The three principal customers knew and *56 discussed their business with both the petitioner and his wife. The three principal customers paid The Calcaterra Service by check through the mail when they were billed. The wife customarily made the deposits of the checks. The petitioner kept no formal bookkeeping records. For the operation of the business, the petitioner customarily kept supplies of gummed paper, print and ink. The expense of these items was small. The expense of mailing amounted to approximately $500 for the taxable year in question. Little correspondence was necessary. The bills and letterheads read "The Calcaterra Service." The entire business was carried on in the home. In the taxable year in question the petitioner required full-time help. He only succeeded in finding such help for approximately three months out of the taxable year when one man did work full time. The service was also assisted by two part-time employees. The petitioner and his wife spent from 8 to 12 hours a day in the operation of the business in 1943; and 12 to 15 hours a day 6 and 7 days a week during the taxable year in question, which was their most productive year, and from 8 to 12 hours a day in 1945. Sometimes the wife did not leave *57 the house for several weeks. The windows of their house were washed by an outside agency, and food was secured from a grocery truck which periodically came to the door. The husband and wife both made whatever decisions were necessary in the operation of the business. Few decisions were required since the business was limited by their facilities and their physical abilities. All expenses and payments were made from the joint account. Both the husband and the wife drew checks on this account. In early 1943 the bank informed the parties that in order to protect the bank the parties should file a certificate with the County Clerk designating the assumed name under which the business was conducted and setting forth the true name of the operators and owners of the business. The petitioner certified with the County Clerk that he, Joseph Calcaterra, was the sole owner and proprietor of the business entitled "The Calcaterra Service." In late 1943 the petitioner read, discussed with his bankers, and determined for the first time that the creation of a partnership by husband and wife was legal. He was told that there need be no written articles, nor any need for the services of an attorney. *58 The petitioner and his wife had always felt that they operated as a partnership. However, to conform to what they understood the law to be, they formally told each other at the end of 1943 that henceforth, after January 1, 1944, they would operate as equal partners, that they would pool all resources, and share all profits and losses equally. The business had not produced distributable profits prior to late 1943. In 1944, the tax year in question, the business reached its peak period of operation and earned approximately $20,000. This amount was reported for the first time on separate returns of the partners. The greater part of profits of late 1943 and 1944 was used to pay off an outstanding mortgage and to purchase an equal amount of U.S. Bonds for each partner in his and her separate name. As of January 1, 1944, petitioner listed the assets of "The Calcaterra Service" partnership as follows: Basement printshop
$8,700
Cash
2,800
Fixtures and printing equipment
5,000
Supplies, paper and ink
1,000 The partnership return disclosed ordinary net income of $22,275.68, distributable $11,137.84 to each partner. During the taxable year petitioner and his wife intended, *59 in good faith, to carry on business as a partnership, the wife contributed services of a vital nature to such business, and a valid partnership existed for "tax purposes." Opinion KERN, Judge: The legal criteria for determining whether a purported partnership agreement between husband and wife has such reality as to be accorded validity for tax purposes have been by this time adequately stated in opinions of the Supreme Court, the Circuit Courts of Appeal and this Court. Neither a restatemet of those criteria nor a catalogue of those decisions is necessary in this opinion. The problem of the instant case has been to apply those criteria, already well-established, to the facts shown by the record herein. Having found the evidentiary facts, and having attempted to give the proper weight to the various factors involved in the application of the criteria above referred to, we have come to the conclusion, already stated as an ultimate finding of fact, that the partnership between petitioner and his wife during the taxable year had reality and should be accorded validity for tax purposes. Decision will be entered under Rule 50.